*Nellie JUDY*, et al.
Plaintiffs-Appellees
*vs.*
*Bobby WHITE*, et al.
Defendants-Appellants

In the Supreme Court of the Navajo Nation

No. SC-CV-35-02

August 2, 2004

512

520

Donovan D. Brown, Sr., and John Kern, and Bidtah N. Becker, Esq., Window Rock, Navajo Nation (AZ), for Defendants-Appellants.

Randolph H. Barnhouse, Esq., Gallup, New Mexico, and Genevieve K. Chato, Kayenta, Navajo Nation (AZ), and Leonard Tsosie, Window Rock, Navajo Nation (AZ), for Plaintiffs-Appellees.

Before SLOAN, Acting Chief Justice, HOLGATE and BEDONIE, Associate Justices (by designation).

Opinion delivered by BEDONIE, Associate Justice.

In this appeal, we are asked to review the propriety of the Chinle District Court's judgment invalidating Navajo Nation Council Resolutions CAP-23-00 and CJY-52-00, and its subsequent entry of a permanent injunction prohibiting the Navajo Nation's chief financial officer from giving continued effect to the invalidated resolutions. We affirm the judgment invalidating Resolution CJY-52-00 on grounds other than that stated by the district court, and reverse as to Resolution CAP-23-00. We also vacate the district court's entry of permanent injunctive relief as to Resolution CAP-23-00, and its order of recoupment.

# I. BACKGROUND

In 1989, the Navajo Nation Council ("Council") enacted sweeping amendments to Title II of the Navajo Nation Code. Title II concerns the powers and functions of the legislative and executive branches of the Navajo Nation government. Amended Section 106(A) set Council Delegates' salaries at $25,000, and Section 1008 set the President and Vice-President's salaries at $55,000 and $45,000, respectively. Both Sections 106(A) and 1008 permit the Council to raise the salaries of all three positions subject to referendum approval by the Navajo Nation electorate. In 2000, the Council adopted Resolutions CAP-23-00 and CJY-52-00. CAP-23-00, passed April 18, 2000, converted Council Delegates' positions from self-employed individuals to common law employees. Resolution CJY-52-00, passed July 20, 2000, increased the salaries of each Delegate, the President and Vice-President by $10,000.

On January 18, 2001, the plaintiffs-appellees filed suit against the defendants-appellants for declaratory judgment and injunctive relief in the Chinle District Court. The plaintiffs-appellees are several individual Navajo citizens. The defendants-appellants are Bobby White, as Controller of the Navajo Nation, and those of his employees who are authorized to manage the Navajo Nation's payroll accounts. For ease of discussion throughout this opinion, the plaintiffs-appellees are referred to as "Judy," and the defendants-appellants are referred to as "White."

Judy sought declaratory judgment and injunctive relief. She asked the district court to declare Resolutions CAP-23-00 and CJY-52-00 invalid enactments because of the Council's failure to follow the proper amending procedures set forth in the Title II Amendments. She then asked, once the court declared the two resolutions invalid, to enjoin White from treating Council Delegates as common law employees and to require him to stop paying Council Delegates the increased salary.

Early in the case, White made several applications to the district court. He first made demand for transfer of the case to the Window Rock District Court pursuant to 1 N.N.C. §555(D), which was denied. He then filed two motions to dismiss: one for failure to state a claim upon which relief could be granted, and one for lack of subject matter jurisdiction. The district court denied the motions and proceeded to trial. Just prior to trial, White made an oral motion to dismiss for failure to sufficiently plead Navajo common law, and in his opening statement requested a directed verdict. Both motions were denied. At the conclusion of the trial, the district court entered its judgment and White appealed. We granted review and heard oral arguments in August 2003. We now issue our opinion.

## II. SUBJECT MATTER JURISDICTION

As an initial matter we consider the district court's denial of White's motion to dismiss for lack of subject matter jurisdiction. We review questions of law *de novo*, without deference to the district court's decision. *Chapo v. Navajo Nation*, 8 Nav. R. 447, 456 (Nav. Sup. Ct. 2004). White argues that the trial court lacked subject matter jurisdiction to consider this case because Judy cannot sue him for acting pursuant to valid legislative enactments. He contends that the presumption of validity attached to CAP-23-00 and CJY-52-00 precluded the trial court from questioning the resolutions. Put another way, White argues that legislative acts are absolutely immune from challenge. We reject that proposition, and do so easily. Our body of decisions demonstrates quite obviously that legislative enactments are, and have been, the subject of challenge. *"The Navajo Courts have the power to determine the validity of resolutions passed by the Navajo Tribal Council." Thompson v. Navajo Nation*, 6 Nav. R. 181, 183 (Nav. Sup. Ct. 1990), citing *Halona v. McDonald*, 1 Nav. R. 189 (Nav. Ct. App. 1978) (emphasis added).

That is not to say that we review legislative acts frivolously or without great deference. "When a court is faced with reviewing any legislative action, that review must be conducted under certain principles." *Benally v. Gorman*, 5 Nav. R. 273, 275 (Nav. Sup. Ct. 1987). The main principle, which we accept as true unless faced with evidence to the contrary, is that the legislative act is proper and legal. *See id.* The second principle that we accept as true is that the Council acted from proper motives. *See id.* We do not examine the motivation behind legislative acts unless we have found that the act was not proper and legal. We have used these principles in our judicial review of Council's acts for more than fifteen years, and reject White's argument that Navajo Nation courts do not have the jurisdiction to make such a review.

## III. STANDING

We next consider White's challenge that Judy lacked standing to bring this lawsuit in Navajo Nation courts. White argues that Judy lacked standing to sue because she, as a private citizen, cannot sue to invalidate validly enacted legislation. For this proposition, White points our attention to *Fulton v. Redhouse*, 6 Nav. R. 333 (Nav. Sup. Ct. 1991). He suggests that *Fulton* establishes the rule that private citizens are not permitted to sue the government just because they are dissatisfied with public law matters, and Judy is a dissatisfied citizen seeking to challenge a legislative act. We read *Fulton* differently. In *Fulton* we denied a dissatisfied voter standing to sue because the Navajo Nation Election Code specifically limits the right to challenge to candidates only. *See* 11 N.N.C. §86(A). Here, there is no such statute. Thus, our consideration of this issue is not controlled by *Fulton*.

In the alternative, White suggests that *Halona* precludes standing. He argues that *Halona* limits suits by private citizens to matters for which legislative

acts intend improper expenditures of the public treasury. Further, he argues that since the legislation at issue here permits expenditures for proper public purposes, i.e., paying public officials for performing public service, Judy does not have standing to sue. As with *Fulton*, we view *Halona* from a different perspective. While the practical aspects of *Halona* pointed to public expenditures for private purposes, we believe the reasoning behind the decision is most instructive here. The Court's ultimate holding was not that a private citizen was entitled to challenge the expenditure of public monies for private purposes, but that a private citizen had standing to challenge the legitimacy of public acts.

Here, the trial court found that Judy had "established that the pay raise had negative impacts upon the people of their chapter and agency . . .," and that she was "individually adversely impacted by the economic consequences of the Council resolutions at issue here." *Judy v. White* No. CH-CV-53-01, slip op. at 3, ¶ 8 (Chin. Dist. Ct. 2002). Based on those findings, the trial court held that as a matter of law, plaintiffs are constituents with standing to challenge the resolutions in question. *See id.*, p.8 at ¶39. We review the issue of standing *de novo*.

The doctrine of standing has its origins in federal law.[1] For more than 200 years, federal courts have interpreted whether cases are properly before them through the development of doctrines of justiciability including standing, ripeness, and mootness. These doctrines are derived from, and intertwined with, the "case and controversy" language within the Constitution. In its theoretical form, justiciability considers whether the dispute sought to be adjudicated can be presented in an adversarial context, in a form historically viewed as capable of judicial resolution by English/American courts. *See Halona v. MacDonald*, 1 Nav. R. 189 (Nav. Ct. App. 1978); *Flast v. Cohen*, 392 U.S. 83 (1968). The history of the U.S. Constitution and federal courts' justiciability considerations is vast and remarkable, and in its review we are once again sharply reminded that it is not our *Diné* history, nor that of our own tripartite government.

The Navajo Nation courts were established by the Navajo Nation Council, and the district courts find their legislative grant of general jurisdiction in 7 N.N.C. §253 (as amended by CO-72-03, 10/27/03). That section confers original jurisdiction to the district courts over crimes, civil actions where the defendant

[1] Article III, §2 of the Constitution provides that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; —to all Cases affecting Ambassadors, other public Ministers and Consuls; —to all Cases of admiralty and maritime jurisdiction; —to Controversies to which the United States shall be a party; —to Controversies between two or more States; between a State and Citizens of another State; —between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." This clause gives rise to the "case and controversy" standard for federal court justiciability, including considerations of ripeness, mootness, standing and the prohibition against advisory opinions.

is a resident of the Navajo Nation or causes an action or injury to occur within the territorial jurisdiction of the Navajo Nation, and "all other matters provided by Navajo Nation statutory law, *Diné bi beenahaz 'áanii*, and Navajo Nation Treaties with the United States of America or other governments." *Id.* The Council could have restricted the Navajo Nation district courts' jurisdiction to the same limited cases and controversies as the federal courts, but did not. Our judicial system mimics the American adversarial system in some ways, but we will not interpret unintended limitations on the district courts based on federal court case law or inapplicable U.S. legislation. That is not to say that we do not recognize the doctrine of standing, but that we do so pursuant to our own common values of substantial justice rather than as the term is understood in federal courts. Navajo courts will take their own path in judicial review, as required by the "Navajo higher law in fundamental customs and traditions, as well as substantive rights found in the Treaty of 1868, the Navajo Nation Bill of Rights, the Judicial Reform Act of 1985, and the Title Two Amendments of 1989." *Bennett v. Navajo Board of Election Supervisors*, 6 Nav. R. 319, 324 (Nav. Sup. Ct. 1990).

Standing may become an issue in any matter before the courts, and we limit our discussion today to standing as it relates to public-law matters and the judicial review of government action.[2] We have considered standing on numerous occasions without articulating a specific test for the district courts to follow. We undertake no such effort today, because we believe that absent specific legislative limitations, anyone may bring a public-law dispute to the Navajo Nation courts. For our courts to close their doors to legislative review based on standing, either as a matter of convenience or to avoid considering sensitive political issues, is an abrogation of our judicial responsibilities and abhorrent to *Diné* concepts of participatory governance and due process. "One of the major differences between Western principles of adjudication and Navajo legal procedure as participatory democracy is that it is essentially egalitarian. Egalitarianism is the fundamental principle of participatory democracy. The egalitarian principle is the ability of the people as a whole to make law." *Downey v. Bigman*, 7 Nav. R. 176, 177 (Nav. Sup. Ct. 1995). It is not for us to choose who may request judicial review. We have never held otherwise.

In *Owens v. Sloan* we held that private individuals do not have standing to raise Sovereign Immunity defenses because that legislative act is meant to shield only public officials or government entities. Only those whom the Act seeks to shield have standing to raise the defenses within the Act. *See Owens v. Sloan*, 7 Nav. R. 215 (Nav. Sup. Ct. 1996). In *Manygoats* we held that a Navajo employee lacks standing to assert that the NPEA violates the equal protection of

2 In practice, most private suits are brought by the individual harmed by the alleged wrong, and standing to sue is therefore self-evident. It is only where the question is of a public nature that an interested community member is likely to bring suit. It is in these latter cases that standing must be more closely scrutinized to determine whether the petitioner's standing is restricted.

hypothetical non-Navajos, because "under basic principles of equal protection of law, any person who is injured by a violation of [the] NPEA may file a claim with the Commission." *Manygoats v. Atkinson Trading Company, Inc.*, 8 Nav. R. 321, 335, at 9 (Nav. Sup. Ct. 2003); *see Staff Relief, Inc. v. Delmar Ray Polacca*, 8 Nav. R. 49 (Nav. Sup. Ct. 2000). In *Fulton v. Redhouse* we held that dissatisfied voters lack standing to bring suit under the election code, because the law limits claims to aggrieved candidates. *See Fulton v. Redhouse*, 6 Nav. R. 333 (Nav. Sup. Ct. 1991); 11 N.T.C. § 86.A (1990). Reaffirming our previous opinions in this area, we recognize only the limitations on standing as properly legislated by the Council.

While we give considerable thought to federal and Navajo Nation statutory and decisional law, we must also discuss standing in the Navajo context. It is without question that in recognizing and giving formality to the Navajo People's fundamental principles and tenets of the *Diné bi'é'óol'įįł* or *bi'í'óol'įįł* or the *Diné* Life Way, the Council conceded that despite its statutory pronouncements there exists a deeper, more profound system of governance. It is abhorrent to the *Diné* Life Way to violate the right of a community member to speak or to express his or her views or to challenge an injury, whether tangible or intangible. This right is protected to such an extent that the right to speak to an issue is not limited to the "real party in interest." Rather, the right belongs to the community as a whole, and any member of that community may speak. The non-Navajo concept of governance protects one's right to speak because that right has historically been oppressed. The *Diné* Life Way has always accepted that right unconditionally. Therefore, we do not focus on the *existence* of a right to speak or express our opinions; instead, we seek to protect the *exercise* of what we inherently know to exist.

Through time, our traditional form of participatory democracy has given way to non-Navajo formality; this flexibility is necessary to accommodate the ever-changing face of Navajo governance and its attendant complexities. But the acceptance of formality does not circumscribe the absolute right of the Navajo citizen to complain about the manner in which he or she is governed. We have said before that participatory democracy does not come from the non-Navajo, and today we aver that it also does not come from the Council. It comes from a deeper, more profound system of governance: the Navajo People's traditional communal governance. Whether governance occurred at a public meeting place, a windmill, someone's homestead, the final day of a traditional ceremony or at a chapter meeting, the root of that process comes from the *Diné* Life Way. Our narratives on the *Diné* Life Way are replete with allusions to communal or participatory governance. Nowhere in our life journey narratives is there any indication that one was denied the privilege to speak, nor shunned for asking. Without legislative prohibition, we will not declare that any individual Navajo citizen lacks standing to challenge governmental conduct.

Judy is a private citizen. She brings her concern about the legitimacy of

governmental action to the court. We find no legislated restriction on her standing to do so. We decline to create one. We affirm the District Court's decision that Judy had standing to initiate and pursue this action.

## IV. PLACE OF TRIAL

We review *de novo* the district court's refusal to transfer the case to the Window Rock District Court. Central to our consideration is the place of trial provision in the Navajo Sovereign Immunity Act ("Act"), which states:

> In any action in which any claim is asserted against the Navajo Nation or any public entity thereof, upon written demand of the Navajo Nation Department of Justice, made at or before the time of answering, served upon the opposing party and filed with the Court where the action is pending, the place of trial of such action shall be changed to Window Rock, Navajo Nation (Arizona).

1 N.N.C. §555(D) (1995). White contends that Section 555(D) is a jurisdictional condition to the continuation of suit against the Navajo Nation in the Chinle District Court. We take from his arguments that all of the Act's provisions, including the place of trial provisions, are jurisdictional. He argues that once he made his transfer demand the Chinle District Court lost jurisdiction over the entire case, and any subsequent proceedings were conducted without authority. He suggests that the only option available to us is to remand to the district court for a mandatory transfer to Window Rock. Presumably, this remand and transfer necessitates a vacation of all of the Chinle District Court's proceedings and orders occurring subsequent to the transfer demand, including the consideration and denial of White's motions to dismiss, the holding of the trial in the Chinle District Court and the district court's ultimate judgment in the case. We reject White's challenge.

The consideration of whether the place of trial provision is jurisdictional is one of first impression. While we have consistently viewed the provisions of the Act as jurisdictional in other cases against the Navajo Nation, those considerations have been limited to the Act's pre-action notice provisions. *See Lee v. Johns*, 3 Nav. R. 229 (Nav. Sup. Ct. 1982*); Hall v. Arthur*, No. A-CV-14-84 (Nav. Sup. Ct. January 23, 1985); *Chapo v. Navajo Nation*, 8 Nav. R. 447 (Nav. Sup. Ct. 2004). We resolved those cases quite easily, because the language of §555(A) clearly states that the pre-action notice requirements are a "jurisdictional condition precedent" to suit. 1 N.N.C. §555(A). But §555(D), at issue in our considerations today, contains no such provision.

It is without question that our government cannot be sued except by its expressed consent. The Navajo Sovereign Immunity Act is the expression of that consent. It provides the means and manner by which suit will be brought against the sovereign. *See* 1 N.N.C. §554(A). The Act limits suits against the sovereign to certain subject matters, sets strict procedural preconditions to suit, and sets

standards by which a case will proceed to trial. In the course of allowing suits against the sovereign, the Act recognizes that the individuals' want for redress of grievances must be measured and balanced against the government's need to function unimpeded. The Act must be interpreted and applied to carry out this purpose. *See id.* We believe that if the Council had intended to make Section 555(D) a jurisdictional condition that all trials against the sovereign be heard in Window Rock, it would have said so. It could have used the same "jurisdictional condition precedent" language but it did not, and we therefore decline to extend the jurisdictional language of §555(A) to §555(D).

Instead, we view the place of trial language as a procedural mechanism to be used at the option of the Navajo Nation Department of Justice. Keeping in mind the purpose of the Act, and that suit against the Navajo Nation is at the prerogative of the Sovereign, it is clear to us that the place of trial is necessarily also at the option of the Navajo Nation. When the Department of Justice makes proper and timely demand for transfer, the Court is without discretion to deny it. The authority to request a transfer pursuant to 1 N.N.C. §555(D) is limited to the Department of Justice, however, and no other party or entity, including the Court, may raise it. If suit is brought in a district other than Window Rock, and the Department of Justice fails to make a proper and timely request for transfer, then the trial will remain in the initial district. In this sense, the place of trial provision in the Act can be waived.

The district courts' jurisdiction is statutorily granted, and jurisdiction cannot be waived. If a court does not have jurisdiction over a party or issue, it cannot proceed to disposition. That the Act itself mandates the transfer to Window Rock only upon proper request, thereby allowing it to be waived or ignored by the Department of Justice, strengthens our conviction that it cannot be a jurisdictional requirement. In a suit against the Navajo Nation, where a timely demand to transfer is made by the Department of Justice pursuant to section 555(D), the trial court is obligated to transfer the case and the failure to do so may lead to a mandamus action compelling transfer.

Our review to this point has been limited to whether Section 555(D) is jurisdictional. Now that we have concluded that it is not, our inquiry turns to whether the court committed reversible error in denying the transfer. We do not believe so.

It is unmistakable to us now that this suit was brought and adjudicated pursuant to the Act, and therefore subject to the conditions for such actions, including mandatory transfer to Window Rock when properly demanded. However, we must contain ourselves to a review of the situation as presented to the trial court in March 2001, when the Demand to Change Venue was filed.

The Demand to Change Venue was the first motion filed in this case after the Complaint. White's argument in the motion is clear: "[t]he Controller is an official of the Navajo Nation and this suit therefore is a claim against the Navajo

Nation," and "the Court is compelled by §555 (D) to order the transfer of venue." Demand to Change Venue, 3/29/2001, No. CH-CV-53-01. In opposition, Judy argued that White was *not* an entity protected under the Act, and that 1 N.N.C. §555(D) "does not apply to individual employees such as Mr. White ..." Response in Opposition to "Demand" for Change of Venue, 4110/2001, No. CH-CV-53-01.

This review of the trial court's record reveals that when White demanded a transfer to Window Rock, the court had not yet ascertained whether this matter was in fact a suit against individuals in a private capacity or protected entities under the Act. We give significant deference to the district court's view of the facts, unless we are left with the firm conviction that a clear error was made. Given the record and the status of the case at the time, both arguments regarding the nature of the suit and the subsequent applicability of 1 N.N.C. §555(D) were plausible. When there are two permissible views of the facts, even if those views are contrary to each other, the district court's choice between the two cannot be clear error.

We are not troubled by the fact that the district court later concluded that this case was brought pursuant to the Act and that White was subject to the Act's protections and defenses. The transfer to Window Rock pursuant to 1 N.N.C. §555(D) may be demanded at any time at or before the time of answering. In this case, White's identity as a protected entity was not settled until disposition of the motions to dismiss for failure to state a claim, at which time White could have made a second demand to transfer pursuant to §555(D).

### V. FAILURE TO STATE A CLAIM

We also review *de novo* the trial court's decision to deny White's motions to dismiss for failure to state a claim upon which relief can be granted. White makes two general arguments. He first contends that because of the presumption of validity attached to Resolutions CAP-23-00 and CJY-52-00, and because he shares the Navajo Nation's sovereign immunity, Judy had the burden of articulating specifically that both resolutions were invalid, and of making an affirmative assertion of which law he is alleged to have violated. White argues that Judy failed to meet this burden, and that her claim therefore fails under 1 N.N.C. 554(G). Second, he suggests that Judy failed to articulate a claim for relief under Navajo Common Law. We consider both arguments simultaneously because they invoke review under Nav. R. Civ. P. 8(a)(3).

The purpose of a civil complaint, and of the requirement that it contain a "short and plain statement of the claim" under Rule 8(a)(3) is to safeguard the basic concept of adequate notice of the case against a party, and to provide the respondent the opportunity to be heard in answer to the complaint. Our rules do not intend that a complaint comprise specific or detailed facts and allegations which would merit a judgment. However, a complaint must make a minimum discussion which gives the respondent and the court some theory of what the

case is about. Additional pretrial processes, including application for a more definite statement (Nav. R. Civ. P. 12(e)), discovery and pretrial conferences between the parties and the judge, further narrow or clarify the claims made in the initial complaint or petition.

## A. FAILURE TO IDENTIFY APPLICABLE LAW PURSUANT TO 1 N.N.C. §554.G

Section 554(G) of the Act permits suit against any officer, employee or agent of the Navajo Nation to compel him or her to perform responsibilities under the expressly applicable laws of the United States and the Navajo Nation. White suggests that the language in this section requires Judy to specifically identify the law which commands his performance of duties, and describe his violations thereto. By his argument, he suggests we read into Rule 8(a)(3) a requirement that does not exist. We decline to do so. As we have said, the short and plain statement requirement is buttressed by the availability of other civil rules and processes which flesh out the details of a plaintiffs claim. We will not require a plaintiff to prove his case against the Navajo Nation at the outset. Despite his argument that Judy should have alleged that CAP-23-00 and CJY-52- 00 were invalid legislative enactments, and that she failed to identify the applicable law under which he was obligated to perform his official functions, White appears to have had little problem deducing that the validity of CAP-23-00 and CJY-52-00 was at the heart of Judy's complaint. Despite the poor draftsmanship of the complaint, the record reflects White's extensive discussions concerning the resolutions' validity throughout his briefing of the issue.

Our consideration of this issue does not end here. We acknowledge that claims brought pursuant to the Act are often poorly articulated, and we therefore give the following guidance to future litigants. It would be sound practice for a claimant in a case against the Navajo Nation to expressly identify the point of applicable law under which an officer, employee or agent is obligated to perform his official functions and the claimed violation thereto. This should be done by identifying the applicable title and section numbers of the Navajo Nation Code, or by stating the fundamental principle relied upon. This way, we believe the need for argument over a failure to state a claim will be minimized. We therefore instruct claimants to identify the applicable law alleged to be performed and the violation thereto in the Complaint. We also direct parties to avail themselves of additional remedies within the rules, including requests for a more definite statement, when necessary.

## B. NAVAJO COMMON LAW

In another request for dismissal, White argues that Judy insufficiently plead Navajo common law in her Complaint. The district court denied the request prior to trial, and we review that decision *de novo*.

In the absence of codified law, our written decisions have always set forth the guiding principles for how Navajo common law is to be plead at the trial level. "Where a claim relies on Navajo custom, the custom must be alleged, and the

pleading must state generally how that custom supports the claim." *In re: Estate of Belone*, 5 Nav. R. 161, 164 (Nav. Sup. Ct. 1987). *See also Navajo Nation v. Platero*, 6 Nav. R. 422 (Nav. Sup. Ct. 1991); *Hood v. Bordy*, 6 Nav. R. 349 (Nav. Sup. Ct. 1991); *Lente v. Notah*, 3 Nav. R. 72 (Nav. Ct. App. 1982). These decisions reflect that the common law pleading requirement is simply an extension of the "short and plain statement" requirement, providing the respondent notice of the claims against him and an opportunity to respond to them.

Judy discusses Navajo common law at length in her complaint. She makes foundational Navajo Common Law discussions by asserting that it "forms a core basis for all Navajo law," and is more important than the written laws which govern the Navajo people. Complaint, 1/18/01, No. CH-CV-53-01, p.4 at ¶20. She also indicates that "[a]ction by Defendants that is contrary to Navajo Common Law or *beenahaz 'áanii* is prohibited." *Id.* at 721. She then points out how White allegedly violated Navajo common law, stating that "[a]ctions by Defendants that takes traditional or reserved power from the Navajo people violates Navajo Common Law and is prohibited," and that "[a]ction by Defendants that results in the transfer of government funds in an unlawful manner is prohibited." *Id.* at ¶¶22,23. Faced with the foregoing discussion, the District Court concluded that the complaint was sufficient. Our review of the complaint does not cause us to disagree with that assessment.

This issue leads us to make some comment on how recent legislation has affected the common law pleading requirements we established in *In re Estate of Belone*. Resolutions CN-69-02 (recognizing the Fundamental Laws of the *Diné*) and CO-72-03 (adopting amendments to 7 N.N.C. §204 choice of law provisions) expand the *Belone* rule beyond the initial pleading requirement for asserting the application of *Diné bi beenahaz 'áanii* in our Courts. Resolution CN-69-02 instructs our judges and justices to take notice of *Diné bi beenahaz 'áanii* in their decisions, when applicable. Thus, the failure to raise *Diné bi beenahaz 'áanii* in the initial pleading will not lead to exclusion of the claim. Importantly, we do not suggest that common law be raised with reckless abandon wherever and whenever it strikes one's fancy, nor that it be raised in dilatory fashion. We suggest that whenever common law is raised, and whether it is raised *sua sponte* or by a party, the parties should be given ample time and opportunity to address the issue.

We do not, today, articulate specific rules of practice or procedure with respect to *Diné bi beenahaz 'áanii* in our courts. As *Diné naat 'áanii* our judges have always been guided by traditional principles; it is at the core of who we are, and a primary expectation of those who seek dispute resolution in Navajo Nation courts. With the legislative acknowledgment of *Diné bi beenahaz 'áanii*, judges and justices will continue to be guided by these core principles, as must the legal practitioners and parties who elect to participate in our legal system. Over time, we are certain that rules and procedures will be developed to ensure the continued responsible jurisprudential use of *Diné bi beenahaz 'áanii*.

## VI. VALIDITY OF RESOLUTIONS

Having disposed of the procedural matters, we now turn to the merits of whether Resolutions CAP-23-00 and CJY-52-00 are valid enactments of the Navajo legislature.

CAP-23-00 was adopted on April 18, 2000, to amend 2 N.N.C. §109 to make Council delegates "common law employees" of the Navajo Nation. It required the Controller to make salary deductions for federal income tax, and additional deductions for social security income. CJY-52-00 was adopted by the Navajo Nation Council on July 20, 2000, to amend 2 N.N.C. §106 to increase the salaries of the Council delegates, the president and vice president. Navajo Nation President Kelsey Begaye vetoed CJY- 52-00, and the Council overrode the veto by adopting resolution CJY-63-00. The claims against White include acting pursuant to invalid legislation by paying out the increased salaries and treating Council Delegates as common law employees. Therefore, if the resolutions are valid Navajo Nation law, then the claims against White must fail. However, if the resolutions are invalid, then the law mandates the lower salaries, and Judy's claims succeed.

What makes a resolution invalid? We have said before that *ex post facto* legislation, laws which deny due process or equal protection of law, and bills of attainder are all invalid forms of legislation because they impact negatively on the substantive rights of individuals. *See Ramah Navajo Community v. The Navajo Nation*, 8 Nav. R. 141 (Nav. Sup. Ct. 2001). We have further announced that resolutions passed in violation of certain procedures are invalid. *See id.* We now clarify what is self-evident: resolutions passed pursuant to an invalid law, even if all procedures are properly followed, are invalid.

Although CJY-52-00 is the focus of this dispute, its ultimate validity turns on the validity of Resolved Clause 7 contained in Resolution CD-68-89, because Resolved Clause 7 is the catalyst for CJY-52-00. If Resolved Clause 7 is invalid, no resolution based on it can be valid.

### A. Resolved Clause 7

Resolved Clause 7 states:

> The Navajo Nation Tribal Council further authorizes, declares and directs that Sections 101(b), 102(a), 1008 and 106(A) of the Title Two (2) amendments, shall not apply to amendments duly proposed by the Navajo Nation Commission on Navajo Government Development.

Resolution CD-68-89, Resolved Clause 7 (1989). Resolution CD-68-89 is the adopting resolution to the Title II Amendments. Resolved Clause 7 appears in the resolved section of the adopting resolution. The Amendments were contained in a separate attachment to CD-68-89 as an exhibit and were more than sixty pages long. They contained overstrikes for deleted language and underscores for new language. The Amendments are now codified in what our Navajo People now

popularly refer to as the "blue book" or *"naltsoos dootł 'izhí,"* Resolved Clause 7 is not codified.

Much was made at the trial level and in the appellate briefs about the interpretation of Resolved Clause 7, and whether it was an alternative to Section 106(A). The interpretation of that clause was the focus of the district court's decision. White argues that this clause is a clear alternative to Section 106(A), and that it permits the Council to raise Delegates' salaries outside of the chapter ratification process if the Navajo Nation Commission on Navajo Government Reform Development so recommends. Judy argues otherwise. She contends that the clause is a clear limitation on any plan proposed by the Commission rather than an expansion of authority.

We step back from the interpretation of Resolved Clause 7 and ask a different question. Does Resolved Clause 7 carry the weight of law? If it does not, then the question of its interpretation is moot.

We have previously addressed the Council's resolution-making process and the weight attributable to certain legislative announcements. "We take judicial notice of the fact that the Navajo Nation Council adopts many kinds of resolutions, which may approve, disapprove or recommend some action, but not all are 'legislative acts' in the legal sense of statutes or legislation as such, which carry the weight of law." *Peabody Western Coal Co., Inc. vs. Nez*, 8 Nav. R.132, 138 (Nav. Sup. Ct. 2001). A resolution is the formal expression of an official body or public assembly, adopted to express an opinion, recommendation or policy direction. *See Black's Law Dictionary*, 6th Ed., 1990, at 1311. Resolutions play an important part in legislative history, to memorialize the motivation behind the passage of legislation, but resolutions cannot be substitutes for properly-enacted legislation.

Title II of the Navajo Nation Code is an organic law, taking precedence over other statutes. *See Bennett v. Navajo Board of Election Supervisors*, 6 Nav. R. 319 (Nav. Sup. Ct. 1990); *Nez*, at 139. "Procedural requirements for the enactment of Navajo Nation legislation must be strictly observed." *Nez* at 139. Placing such importance on procedural requirements ensures consistency in enacting legislation and allows notice to everyone involved about exactly what the new legislation will provide, if approved. Title II requires resolutions proposing new laws or amendments have certain indications. Specifically:

> All resolutions proposing new laws or amendments of laws shall clearly indicate new language by underscoring the new language and deletion by overstrike and shall refer to appropriate Navajo Nation Code titles and sections.

2 N.N.C. §165 (1989). Resolved Clause 7 does not comply with the procedural requirements of Section 165. Although the exhibits attached to the resolution carried the required overstriking and underlining, the clauses within the body of the resolution itself did not. We acknowledge that Section 165 was under

contemporaneous consideration with Section 106(A) and had not yet become law, but we believe that the Council nonetheless intended then that amendments to any Navajo Nation statutory law ought to reflect the same deliberation and contemplation that it gave to the Title II amendments, given the then-recent governmental controversy. Therefore, we hold that Resolution CD-68-89, Resolved Clause 7 (1989) was not a legislative act carrying the weight of law.

Any further argument or analysis about the meaning of Resolved Clause 7 is moot. There is no need to analyze the grammar structure or plain meaning of invalid legislation. Because Resolved Clause 7 does not carry the weight of law, it cannot provide a legal alternative for increasing salaries without proper chapter ratification.

## B. CJY-52-00

2 N.N.C. §106(A), as codified, is the only valid legislation which can form the basis for Council Delegate salary increases. 2 N.N.C. §1008, as codified, is the only valid legislation which can form the basis for the President's and Vice President's salary increases. Resolution CJY-52-00 clearly increased those salaries, and was approved in violation of 2 N.N.C. §§106(A) and 1008. Resolution CJY-52-00 is invalid, and any payment of salaries in excess of those mandated by 2 N.N.C. §§106(A) and 1008 is illegal. We therefore affirm the trial court's decision invalidating CJY-52-00. We also note that it has been fifteen years since the Title II Amendments, and the Council has not found it necessary to amend or clarify Section 106(A) to include the language contained in Resolved Clause 7. Section 106(A) is clear on its face, and there is no disagreement that it is statutory law. In the absence of any amendments we assume the validity of Section 106(A) as codified law.

## C. CAP-23-00

Resolution CAP-23-00 does not suffer the same deficiencies as Resolution CJY- 52-00. The purpose of C3Y-52-00 was to amend 2 N.N.C. §106(A) to effect another means for a salary increase for Council Delegates, the President and Vice-President. Resolution CAP-23-00 amends 2 N.N.C. §109, the section that established Council Delegates' federal tax status as self-employed individuals. It converted the Delegates' self-employed status to common law employees, and directed the proper tax deductions. Amendment of Section 109 did not require the chapter ratification process as did Section 106(A), and for good reason. Whether a Delegate was self-employed or a common law employee, the salary remained at $25,000. There was no significance to the change except a shift in the responsibility for payment of individual tax liability. As a self- employed individual each Delegate bore sole responsibility for his federal taxes, whereas as a common law employee, the employer shared part of the social security and Medicare tax burdens. Whether those tax liabilities were borne solely by a Delegate or shared by the Navajo Nation, the liabilities were measured against a salary of $25,000. If there were to be any benefit gained by a Delegate as a result

of the amendment, it would be in the form of the employer's assumption of responsibility for a portion of the social security and Medicare tax liabilities. The Delegate would not receive an increase in the $25,000 salaried amounts.

Had the Title II Amendments contemplated that additional tax benefits operate to increase Delegate salaries, it would have subjected Section 109 to the same chapter ratification process. The Council recognized that the federal taxing process was keyed to the salary set by 106(A), and not an amount in addition to the salary. In passing CAP-23-00, the Council recognized that the legislation dealt only with employment benefits and, *"not salary increases for Council Delegates,"* CAP-23-00, Resolved Clause 2 (April 19, 2000) (emphasis added). CAP-23-00 carried the proper strikeovers and underscores. It was not approved pursuant to Resolved Clause 7, nor put to a referendum vote requiring ratification by two-thirds of the Chapters, because the Council recognized that those procedures were necessary only for a salary increase. In this respect, we disagree with the district court that CAP-23-00 was a salary increase and thus subject to the procedural demands of Section 106(A). We vacate the district court's decision.

## VII. DIRECTED VERDICT

White contends that the trial court committed reversible error when it denied his motion for directed verdicts made at the opening of the case. We reject this argument as well. A directed verdict is properly invoked only during a jury trial. It serves the purpose of taking the case out of the hands of the jury for decision by the court when the defendant believes the plaintiff has failed to make a *prima facie* showing of liability. In this case, trial was held before the court sitting without a jury, and thus a motion for directed verdict was not available to White. What White calls a motion for directed verdict was in fact a renewed motion to dismiss for lack of subject matter jurisdiction or for failure to state a claim. We have already disposed of those matters, and need not repeat ourselves here. The district court did not err in denying the motion for directed verdict. We affirm.

## VIII. RECOUPMENT

Lastly, we consider the District Court's mandate that White "take such actions as may be necessary to recoup illegal payments of salary, deferred compensation or tax contributions by the Navajo Nation, and to seek assistance of pertinent Navajo Nation officials for such purposes." *Judy v. White,* No. CH-CV-53-01, slip op. at 12 (Chin. Dist. Ct. August 21, 2002). We reverse and vacate the district court's judgment.

1 N.N.C. §554(G) waives the immunity of Navajo Nation officers, employees or agents from suit "to compel him/her to perform his/her responsibility under the expressly applicable laws of the United States and of the Navajo Nation, . . ." It was pursuant to this section of the Act that the District Court had jurisdiction to adjudicate this case, and we find no alternative basis under the Act for Judy's claim. This waiver of immunity is more limited in relief to declaratory or

prospective mandatory or injunctive relief. 1 N.N.C. §554(G)1.

In her prayer for relief, Judy did not ask for recoupment. The trial court entered its judgment independently. The trial court erred in issuing the order of recoupment. Even if, for the sake of argument, a proper and timely request was made for recoupment, retrospective relief is prohibited. *See Raymond v. Navajo Agricultural Products Ind.*, 7 Nav. R. 142, 145 (Nav. Sup Ct. 1995); *TBI Contactors, Inc. v. Navajo Tribe*, 6 Nav. R 57, 61 (Nav. Sup. Ct. 1988). A Navajo Nation official may not be compelled to give retrospective relief.

We recognize the consequences, in this case, of the prohibition of retrospective recoupment under 1 N.N.C. §554(G), but are bound to follow the plain language of the law. Even when the consequences are harsh, it is impermissible for the courts to mitigate those consequences through legislation from the bench. The District Court compounded the consequences when it stayed its order, and that stay was granted in error. When a district court stays its decision pending an appeal, the stay must be granted on equitable or legal considerations. In this case the District Court granted the stay, allowing significant funds to be paid despite its finding that those payments were illegal, after ordering that the payments be recouped.

Nevertheless, retrospective relief in a case brought pursuant to 1 N.N.C. §554(G) is clearly prohibited. Despite our finding that the District Court erred in both its original recoupment order and subsequent stay, there is no legal relief we can grant from those consequences in this action. We recognize the inequity caused by our opinion today, particularly for the members of the twentieth Council, who had nothing to do with the passage of CJY-52-00. We are bound to render our final opinion based on applicable laws and foundational principles, and this we have done. Our Navajo way dictates that we also make some commentary on the circumstances created by the misapplication of Resolved Clause 7. To do this, we must give thought to the propriety of the Council's actions in attempting to bypass Section 106(A) through Resolved Clause 7. We address this issue because the trial court's judgment speaks to the issue and asserts that the Council's conduct borders on unjust enrichment, if that term can properly be used in this context. While we do not pronounce such condemnation, we must nonetheless remind public officials the duties and responsibilities incumbent on them as the People's leaders.

As *Diné bi naat'áanii* we are gifted with the treasures of community influence and recognition, while at the same time we carry the burden of leadership and safeguarding the interests of our people. The Council understood its obligations under 106(A) and attempted to comply by giving way to the Chapter ratification process. When that failed, it attempted a bypass. Had the Council properly approached the chapters, they would not have failed, perhaps. But, at the very least, the members of the Council would have taken their concern for delegate welfare to the very people who voted them into office. That is the Navajo way.

We refer to it in Navajo as *"Baa níjookąąh"* or "you beg leave" of your people. That has been the Navajo way for centuries. There is a custom to be followed, and the 1989 Council recognized the necessity of its observance. The ritual goes like this: you approach and ask. The act of approach suggests humility and equality. In the course of asking you speak of your status, your need for recompense and you beg leave. While your request may not be honored, the act of approach and request strengthens ties and relations. The cornerstone of this custom is *K'é*. Whether your request is honored depends on the following of the custom and your people's acceptance of the merits of your request.

