No. SC-CV-45-96

# Supreme Court of the Navajo Nation

**Eulynda Benalli, Plaintiff/Appellee,**
**v.**
**First National Insurance Company of America,**
**Defendant/Appellant.**
**Decided June 23, 1998**

## OPINION

Before YAZZIE, Chief Justice, AUSTIN and *FERGUSON (*sitting by designation), Associate Justices.

Michael P. Gross, Esq., Santa Fe, New Mexico, and Theodore W. Barudin, Esq., Albuqueruue, New Mexico, for the Plaintiff/Appellee; and James J. Mason, Esq., and Luke A. Macik, Esq., Gallup, New Mexico, for the Defendant/Appellant.

Opinion delivered by YAZZIE, Chief Justice.

This appeal is from an October 16, 1996 order of the Window Rock District Court which granted Plaintiff/Appellee Eulynda Benalli's motion for summary judgment. We review the order *de novo* because in the appeal of a summary judgment, this Court is in the same position as the trial court in reviewing the submitted record to decide whether there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Both parties assert that they are entitled to judgment as a matter of law.

### I

On June 10, 1993, between 10:03 and 10:30 a.m., Eulynda Benalli ("Benalli") was driving a 1992 Dodge van to make home visits to the residences of Canoncito youths who would participate in a scheduled "LaLuz Trail Hike." Canoncito is in the New Mexico portion of the Navajo Nation. She drove north on Navajo Route 56, to approximately a mile and a half south of the Canoncito School. While the van was going down a hill, a 1975 Ford pickup truck driven by Edison Largo Sr. crossed the center line and hit the van head-on. The accident report shows that there were twelve passengers in the van. Largo was killed and Benalli and five children were injured. Benalli's injuries exceeded the $60,000 uninsured motorist coverage on the van, and she received a pro rata share of that

amount with the injured children. Largo and Benalli are Navajos and the accident happened within Navajo Indian Country. Largo and his vehicle were not insured.

The Canoncito Community School Board of Education, Inc. ("Board") is a New Mexico nonprofit corporation which has a contract ("P.L. 93-638" contract) with the Bureau of Indian Affairs under the Indian Self-Determination and Education Assistance Act of 1975. The contract permits the Board to lease property from the federal General Services Administration ("GSA"), which requires the Board to carry insurance on its equipment, including the van.

On June 3, 1992, the Board signed a letter agreement with the Center for Indian Youth Program Development of the University of New Mexico Department of Pediatrics to "assist the efforts" of the Center's Canoncito Wilderness Discovery Program. The Board agreed to provide "at cost" a "GSA 12 passenger van" for $180.00 per month plus $0.165 per mile and "$167.42 a month for full insurance coverage." The Board sent the Center statements that billed for the insurance coverage. In later years, including 1993, the Board and the Center used the letter agreement to continue the Canoncito Wilderness Discovery Program by oral agreement.

The Board wanted certainty that Benalli, as the driver of the van, had insurance coverage. The letter agreement requires "full" coverage. Although not required by the insurance policy, the insurer required the Board to periodically report the names and driver's license status of its drivers. On July 7, 1992, Cam Pfeiffer, the Board's Operations Manager, asked the insurance agent to "add full coverage" on the GSA van and to "add to our driver list Ms. Eulynda T. Benalli," giving Benalli's date of birth, license number, and license class.

There is some confusion about Benalli's relationship to the Board. According to Pfeiffer, Benalli was a staff member of the Canoncito Community School (which is separate from the Board) and the director of the "Canoncito Wilderness Challenge [Discovery] Program" sponsored by the University of New Mexico. She was a tenured teacher at the school and carried out the Wilderness Discovery Program during the summer. She implemented the program and transported children home after activities.

According to Patricia Cormick, "an insurance person" from Albuquerque, there was no time limit for coverage based upon the names of drivers submitted by the Board, and Cormick would not "delete a driver" unless "Pfeiffer or someone from Canoncito asked me to delete a driver." According to Charles Dwyer, of the Insurance Exchange (the insurance agent), "designation as a driver would last ... forever." The insurance agent did not "take names on and off."

While the Board did not employ Benalli, she performed functions the Board supported for the benefit of Canoncito school children. This is a joint venture, and the Board clearly desired that Benalli have full insurance coverage under the Board's policy while driving its van. The ultimate issue is what that coverage happened to be.

We set forth the actual terms of the insurance policy and discuss their inter-

pretations below. The insurer, which was the defendant below, is the First National Insurance Company of America ("First National"). Insurance Exchange, the insurance agent, issued a certificate of insurance which shows that insurance coverage is by the Safeco Insurance Company ("Safeco") and Millers Group Insurance Company. We are asked to construe the policy issued by Safeco, which has several standard forms as part of the insurance contract.

The "Business Auto Coverage Form" states as follows: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations." Words in each form are highlighted by quotation marks to refer the reader to specific definitions. Therefore, we know that 'you' means the Board. It is a New Mexico nonprofit corporation engaged in the business of education, and it decided to "assist the efforts" of the Canoncito Wilderness Discovery Program by providing the van, at cost, and also providing "full insurance coverage" under the Safeco policy.

The coverage in the Business Auto Coverage Form is as follows: "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered vehicle." This is obviously liability coverage and not an uninsured motorist provision.

The form then tells us "[w]ho is an Insured":

> The following are 'insureds':
> A. You for any covered 'auto.'
> B. Anyone else while using with your permission a covered 'auto' you own, hire or borrow except:....

The exceptions, or exclusions, are those from whom the insured hires or borrows the "auto," an employee if that "auto" is owned by the employee or a member of his or her household, someone using the "auto" while working on it, those who are moving property to or from an "auto," or a partner who owns the "auto." These exclusions do not apply here. The third class of "insured" is "[a]nyone liable for the conduct of an 'insured' described above but only to the extent of that liability."

Among the exclusions from the policy are "[l]iability assumed under any contract or agreement, but the exclusion does not apply to liability for damages under an 'insured contract.'" The most closely applicable classification under the "insured contract" definition is as follows:

> That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for 'bodily injury' or 'property damage' to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

The parties did not address this category of "insured," or the "insured contract,"

at all; therefore, we are hesitant to apply it to this case. However, it appears that the Board had an "insured contract" with the University of New Mexico program whereby the Board assumed the tort liability of the Canoncito Wilderness Discovery Program.

This is an uninsured motorist coverage case. There is a separate "New Mexico Uninsured Motorists Coverage" endorsement for commercial auto use. It modifies the provisions of the Business Auto Coverage Form discussed above. It indicates that the coverage is to pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle," because of "bodily injury" sustained by an "insured" and caused by an "accident."

The key to the disposition of this case lies in the definition of "Who is insured." According to the endorsement, the following are insured:

> 1. You.
> 2. If you are an individual, any 'family member.'
> 3. Anyone else 'occupying' a covered 'auto' or a temporary substitute for a covered 'auto.'...
> 4. Anyone for damages he or she is entitled to recover because of 'bodily injury' sustained by another 'insured.'

There is no definition of "you" in the endorsement, so it has to be the "you" in the Business Auto Coverage Form, "the Named Insured shown in the Declarations." The renewal certificate in evidence states that the "named insured" is the Canoncito Community School Board of Education, Inc. A "family member" is someone related to "you" by blood, marriage and adoption who is a resident of the same household. A person is "occupying" by means of being "in, upon, getting in, on, out, or off [an "auto"]. "Auto" is not defined in the uninsured motorist declaration, so it must be the "Auto" defined in the Business Auto Coverage Form, "a land motor vehicle, trailer or semitrailer designed for travel on public roads but does not include 'mobile equipment.'"

First National asks this Court to literally apply the policy's terms when it is hardly a model of clarity. The moving papers, exhibits, briefs, and oral argument in this case raise these issues: 1) Should the Navajo Nation adopt the insurance doctrine of "stacking" coverage; and 2) Is Benalli entitled to stack coverage under the policy's terms.

## II

We decide the first issue using the following process: 1) define the term "stacking"; 2) discuss the public policy applicable to insurance coverage within the Navajo Nation; and 3) choose the law which will apply in this case.

One definition of stacking is that it "is a term that refers to obtaining for a single loss proceeds from duplicate coverages. If an insured is allowed to stack coverages, the insured is allowed to recover for damages received a sum up to the stat-

ed limit of each policy that provides coverage." R. H. Jerry II, *Understanding Insurance Law* § 136D (2d ed. 1996) (hereafter "Jerry"). Another definition says it is a term "used to describe a situation where all available policies are added together to create a larger pool from which the injured party may draw in order to compensate him for his actual loss where a single policy is not sufficient to make him whole." 12A *Couch Cyclopedia of Insurance Law* § 45:628 (June 1996 Supp.). As noted by the trial court, "the trend appears to be in favor of stacking." *Id.*

An additional consideration is "[t]he problem of stacking and the determination of which policies may be called upon to respond to the loss will be a continuing problem, but the practitioner must be aware of the liberal purpose behind the UM [uninsured motorist] statutes which may serve as rationale for creating whatever fund is necessary to compensate the innocent, injured party." *Id.* Some courts and writers prefer to use the terms "pyramiding" or "aggregating" benefits to avoid the impression of a duplication of benefits, but "stacking" is the most common term. Jerry, *supra,* at § 136D[c].

Actually, stacking is a common sense principle. It says that if you buy insurance for more than one vehicle and pay insurance premiums for uninsured motorist coverage more than once, you should be able to have the benefit of all the coverage you buy. So, if (as here) you have a policy with a limit of $60,000 of coverage on one vehicle, and there are five vehicles with five separate premiums, then there is a total possible coverage of $300,000.[1]

There are two kinds of stacking: "judicial stacking"; and "policy stacking." *Jaramillo v. Providence Washington Ins.*, 117 N.M. 337, 339 n.1, 871 P.2d 1343 (1994).

> 'Judicial stacking' is a rule of construction applied by the courts based on public policy. Under judicial stacking, a class-one insured is entitled, as a matter of law, to aggregate all UM [uninsured motorist] coverages purchased with separate premiums. A class-one insured in judicial stacking refers generally to those persons who are 'named insureds' under a UM policy. In contrast, 'policy stacking' refers to a policy which by its own terms expressly grants a right to stack coverages. If the policy is unambiguous, the 'insured' who is entitled to policy stacking is determined by the policy's language and definitions, and the coverage is enforced as written.

*Id.* (citation omitted).

It is most curious that while First National continuously reiterates the language of paragraph 2 of the "High-Low" settlement agreement and release of January 23, 1996, item E of the recitals indicates that "there has been a good faith

1. Curiously, while First National complains of the unfairness of not receiving credit for Benalli's worker's compensation payments, the parties' "High-Low" settlement agreement of January 23, 1996 says that if Benalli prevails on the stacking issue, she will get an additional $135,000 in addition to the $60,000 already paid to her, or $195,000. That is $105,000 less than the total sum which would be available if stacking is permitted.

dispute between Releaser Eulynda Benalli and insurer relating to whether she is a Class I or Class II insured."[2] Given the actual agreement of the parties, this is a "policy stacking" case. That is, whether Benalli may "stack" is governed by unambiguous terms of the policy as written.

Only Navajo Nation law applies to the public policy determination of whether stacking should be permitted in this jurisdiction. However, we note that this insurance policy was written to respond to the requirements of New Mexico law. The parties anticipated that the policy would be determined in accordance with the New Mexico insurance law climate. Accordingly, while we will not apply New Mexico precedent construing policies such as the one in this case, we will look closely at New Mexico decisions for guidance to assure the legitimate expectations of the parties.

The Navajo Nation policy is the same as that of New Mexico. Because large numbers of individuals in this region do not have liability insurance, insurance companies should be required to provide uninsured motorist coverage for their policyholders. The language which provides such coverage will be liberally construed to carry out the purposes of compensating those who are injured to the extent that an insured pays premiums for more than one vehicle. The insurance company bears the additional burden to know the expectations of special classes of policyholders (i.e., fictitious entities and corporations which conduct public business) and to clarify the coverage of a policy where it may appear that the insured has certain execrations about the scope of coverage. A large portion of the Navajo Nation is within the boundaries of New Mexico. That is where First National does business. Everyone in this region, including insurance agents, is aware that there are large numbers of Indians in New Mexico and that they have their own territories, laws, and organizations. Insurance companies cannot escape those facts and they should take into consideration Indian nation public policy.

## III

An insurance policy is nothing more than a contract. Therefore, construction of an insurance policy is governed by the law of contracts. *Jaramillo v. Providence Washington Ins.*, 117 N.M. at 340. There are special insurance contract rules which apply to identify those who show they are within the class of insureds the policy is intended to benefit. *Id.* at 339. Stacking is also "a rule of construction applied by the courts based on public policy." *Cravens v. Northland Ins. Co.*, No. 94-1292-M Civ. (D.N.M. May 10, 1995), slip mem. op. at 5 (citing *Jaramillo*, 117 N.M. at 339 n.1).

The analysis in a policy-stacking case follows these steps: 1) whether stacking can be determined by the unambiguous language of the policy; 2) if "a con-

2. The parties failed to clearly distinguish the two stacking doctrines recited above. The class distinctions are essentially between injured individuals who are considered to be "the insured" (Class I) and those who are not (Class II). See the discussion below.

tract is 'reasonably and fairly susceptible of different constructions,'" the court must use extrinsic evidence to decide whether an ambiguity exists; and 3) if the court finds ambiguity, it must resolve it using rules of contract construction, including determining the parties' intentions. *Cravens*, slip mem. op. at 6-8. The rules of contract construction include the principle that "'the insurer who drafts the policy must reasonably anticipate the effect of the language used on the untrained mind, or how the language is understood by the ordinary person.'" *Cravens*, slip mem. op. at 9(citing *Rodriguez v. Windsor Ins. Co.*, 118 N.M. 127, 131, 879 P.2d 759, 763 (1994)). Where there is ambiguity, "'the test is not what the insurer intended the words to mean, but what a reasonable person in the insured's position would have understood them to mean.'" *Cravens*, slip mem. op. at 13 (citing *Western Commerce Bank v. Reliance Ins. Co.*, 105 N.M. 346, 348, 732 P.2d 873, 875 (1987)). One of the reasons New Mexico allows stacking is to fulfill an insured's expectations which arise from paying multiple premiums. *Id.* (citing *Lopez v. Foundation Reserve Ins. Co.*, 98 N.M. 166, 170-171, 646 P.2d 1230, 1234-35 (1982)).

First National faults the trial court for its method of construing the insurance policy and says that the court "reformed" or changed the policy rather than simply apply it. If, however, there is an ambiguity about an "expressly named" insured, then the Court must examine the facts to determine what the parties intended the contractual language to mean. *Jaramillo*, 117 N.M. at 337. Another issue in this case is whether Benalli is a third party beneficiary (assuming she is not an "insured"), so this Court must look to the contract or other evidence which shows the intent to benefit a third party, and Benalli must show that she belongs to the class of intended beneficiary. *Id.* at 343. The following factors apply in situations where the claimant is not a "named insured" or the "insured": "1) whether the claimant was named or designated as an insured in the policy or was an insured only because he was a passenger in a covered vehicle (occupancy insured); 2) whether the claimant paid the premium; and 3) whether the insured can be said to have reasonably expected to receive coverage for each vehicle included under the policy." *Lee v. Ins. Co. of North America*, 762 P.2d 809, 911 (Hawaii App. 1998).

We construe the insurance contract against First National and in favor of Benalli, because First National wrote the contract. Its lawyers or drafters designed a large, standard-form agreement which the Board had to accept on a "take it or leave it" basis. There is an imbalance in the bargaining position of insurance companies and their customers, so courts traditionally correct such imbalances in imposed agreements by construing the agreement in the customers' favor.

Benalli is clearly an "insured" under the uninsured motorist endorsement. She was someone who was "occupying" the covered "auto," the van. However, the limit of insurance clause states that "the most we will pay for all damages resulting from any one 'accident' is the limit of Uninsured Motorists Coverage shown

in the Declarations," i.e., $60,000 paid on a pro rata basis among injured claimants. The clause continues that "if there is more than one covered 'auto,' and 'bodily injury' or 'property damage' is sustained by you or any 'family member,' our Limit of Insurance for any one 'accident' is the sum of the limits applicable to each covered 'auto.'" An "insured" other than "you" or a "family member" is limited to a recovery of $60,000.

While this would appear to decide the issue, given that Benalli is an "insured" but not a "family member," there remains the question of whether she is a part of "you," i.e., the Board, or is the equivalent of a "family member," given the intentions of the parties and the legitimate expectations of the Board and the Canoncito Wilderness Discovery Program. In the *Cravens* case, the policy was issued to an individual with a "d/b/a [doing business as]" name to operate an auto dealership. The issue there was whether the individual's children, who did not fit the "family member" definition, were covered as the dealership's employees. The federal district court resolved the issue using extrinsic evidence to determine the ambiguity of the agreement and the parties' intentions. The federal court looked beyond the literal terms of the insurance agreement to determine what the person who bought the insurance really intended.

We find that the policy terms here are ambiguous. While it is true that "you" is a corporation, and not a flesh-and-blood being who can suffer injury from the parties' dealings, we find that "you" is ambiguous as a matter of law. This litigation and the parties' "High-Low" settlement agreement show that the parties agree that there is an ambiguity as to whether Benalli is a "you" or otherwise entitled to stack.

How did the Board understand the policy? The insurer required the Board to submit lists of its drivers, along with their driver's license status. The testimony shows that the insurance agent accepted the lists. We are not told why this was done. Perhaps the insurer wanted to know if those who drove the vehicles had valid licenses or had traffic charges which might affect their risk as drivers. We do know that the Board and the Canoncito Wilderness Discovery Program wanted to make certain there was "full insurance coverage." Pfeiffer asked for "full coverage" on the GSA van and specifically requested that Benalli be added to "our drivers list." While the insurance agent may not have known about the arrangement between the Board and the Program, we can clearly see that the Board wanted to be certain that its drivers had "full coverage." Those expectations were communicated to the insurance agent as the Board periodically informed the insurance agent of the names of its drivers. The Board submitted separate lists of "regular" employees and Benalli's name for her Board-sponsored project.

The insurer has a duty to make its policy terms clear. "'[T]he insurer has a duty to make any limitations of or exclusions from coverage both clear and conspicuous: Any limitations should be so written that the insured, by reading the policy, can understand what the exclusions are, when they are given a reasonable and fair interpretation.'" *Cravens*, slip mem. op. at 14 (citing *Rodriguez*, 118 N.M. at 133,

and quoting 13 J. A. Appleman & J. Appleman, *Insurance Law and Practice* § 7403, at 318-20 (1976)). The insurance agent knew the Board was a school board. It knew that the Board wanted its drivers covered. It knew that the Board was paying for uninsured motorist coverage for five vehicles and that it would reasonably expect full coverage, including the ability to stack, particularly when the Board sent lists of employees and specifically submitted Benalli's name.

Benalli claims to be a beneficiary, so any intent to benefit her as a third party must be gleaned from the term identifying the class of intended beneficiaries, i.e., "You." It is clear that such was the intent of the Board, because it knew that Benalli would drive the van as a project director and specifically provided that its insurance would cover her. We impute the agent's knowledge to First National, because of the agency relationship.

The third party beneficiary theory applies when the third party gave no consideration. In this situation, the University of New Mexico in fact paid a premium. In addition, the Board, as the "insured," reasonably expected to have coverage for each vehicle under the policy. It believed its drivers were a "You," and paid the premiums based on that expectation. First National, through its agent, was in a position to see the Board's (through its representatives) expectation and to correct any misconception. In fact, First National had an affirmative obligation to correct any misconceptions in clear exclusions and it did not do so. Instead, it required the Board to supply the names of its drivers (without saying why) and helped reinforce the expectation and understanding that there was "full" coverage on both the van and Benalli as its driver.

## IV

We take this opportunity to clarify the Navajo common law concept of *nalyeeh* as a separate ground for finding that Benalli was a "You" under the policy. Insurance is nothing more than risk-sharing. People who want help when they get hurt put money into a common money bag and entrust that bag to someone. When one of those people is hurt, they go to the holder and ask for help based on their need. Everyone agrees on how much money needs to be put in the bag. Here, the Board can be likened to a clan group. While there were no corporations or other fictitious entities under Navajo common law, clans have always been recognized as an identifiable group. The Board assumed Benalli into its "clan" membership. It expected that Benalli would be one of its "relatives" if she got hurt.

First National holds the bag. The Board trusted First National to hold its money, and it paid extra for five vehicles. The Board placed its trust in First National and expected that if the Board's relative was hurt, she would receive benefits in accordance with her injury. Benalli also argues that First National owes her *nalyeeh* as the uninsured motorist's "relative." In a sense that is true.

When there is an injury, Navajo common law requires the negotiation of the amount of *nalyeeh*[3] based upon the effects of the injury and the ability of the tortfeasor and his or her relatives to make things right. The Navajo maxim is that it should be enough "so there will be no hard feelings."

In this case, First National was prepared to pay based on stacking. Benalli's expert stated that the premiums paid by the Board were similar to those paid by an individual who owned more than one vehicle. Benalli's need exceeded the amount set aside for one vehicle, but in fact First National, as the uninsured motorist's "relative," had the ability to pay more, based upon the sums the Board put into the money bag.

We observe that while the counsels for the parties made excellent arguments about *nalyeeh,* the best argument was that made in Navajo by Benalli herself. She introduced herself by clan, and clan relation is the basis of *nalyeeh.* If a person is hurt, he or she looks to clan relations for help. The tortfeasor and his or her relatives are expected to set things right in accordance with the hurt. That is done on the basis of the ability to help, and in this case, that ability is measured by the amount of money put into the bag and the understanding that there are certain persons who should benefit from the money in the bag.

## V

We summarily address First National's remaining arguments because they are not essential to this decision. The trial court did not "rewrite," "reform," or otherwise tamper with the actual insurance contract. It construed it in accordance with standard contract interpretation principles. The parties' "High-Low" settlement agreement settles this argument. They were engaged in litigation over the insurance policy, and they specifically agreed there was a dispute over whether Benalli was entitled to stack. First National's agreement was an acknowledgment that the contract's terms were vague and required court interpretation. Contract construction is difficult, but this case contains an area of the law which requires a determination of public policy. The public policy is to assure that those who are injured by an uninsured motorist and who are closely associated with an "insured" get the benefit of all premiums paid for coverage. The trial court did not amend, nullify, or rewrite the agreement.

We listened to First National's "parade of horribles" arguments, including the possibility that it would have to pay out large sums of money for a comparatively small premium, and that insurance rates will go up in the Navajo Nation if this Court adopts the stacking doctrine and applies it to this case. Some courts have rejected stacking because of the possibility of extensive exposure for large numbers of vehicles. That is not the situation here and any potential liability based

3. While the term *nalyeeh* is often used in the sense of an amount of payment, it actually expresses the mode of payment, i.e., the respectful negotiation of the amount an offender should pay based upon the injured person's needs and the offender's ability to pay, including the ability of relatives and clan members.

upon large numbers of vehicles is at this point pure speculation. No one told this Court how premiums are set or the areas for which they are set. We assume that First National complies with discrimination law and that there is no "red-lining" where Navajos must pay more for insurance than others. Insurance companies hire actuaries to estimate potential liability based upon the incidence and kinds of auto crashes and they take the possibility of stacking decisions into account. There was utterly no factual showing to support the "parade of horribles" argument that a ruling by this Court will drive up the premiums Navajos and Navajo Nation organizations will have to pay.

We avoid the use of the term "designated driver" although the trial court correctly interpreted the contract using that term. This opinion takes another approach.

The worker's compensation argument is irrelevant, because the parties specifically took it into account when signing the "High-Low" settlement agreement. No one told us why Benalli will not recover the full stacking amount, and First National waived or addressed its worker's compensation recovery claims in the agreement.

Sovereign immunity is irrelevant to this case. It is circular reasoning to say that First National stands in the Board's shoes and that immunity from suit to the extent of insurance coverage protects First National. The extent of insurance coverage is the very issue before the Court and one that First National agreed would be posed to the Court.

We decide the merits of this appeal because there was substantial compliance with the final judgment rule and this litigation has gone on too long already. One of the major policies of law is that courts should discourage multiple litigation by using their inherent authority to control the progress of cases. This was a complex and confusing appeal because of a lack of detailed findings of fact and the need to undertake a *de novo* review of a large number of documents and exhibits. We do not want to send this case to the trial court and then have to deal with it again. Accordingly, Benalli's motion to strike notice of appeal and the Navajo Nation's motion to appear amicus curiae are denied.

The judgment of the Window Rock District Court is affirmed. This cause is remanded to that court for further proceedings, including those involving costs and fees.