OPINION

This matter arises from an appeal of a December 15, 2009 initiative election in which a majority of Navajo voters approved a reduction of the size of the Navajo Nation Council from 88 to 24 delegates. This phase of the appeal concerns whether attorneys’ fees may be awarded out of $150,000 in public funds appropriated by the Intergovernmental Relations Committee to “Navajo Nation persons” for purposes of challenging the above election through the hire of independent counsel. Specifically, the assistance was spent in hiring John Trebon to represent Appellant Nelson in his filing of a grievance against the President of the Navajo Nation and the Initiative Committee to Reduce the Navajo Nation Council before the Office of Hearings and Appeals (OHA), and then appealing the decision of the OHA to this Court.
We find that the enactment and grant agreement procedures regarding the above public funds fail to comply with fiduciary safeguards in place pursuant to 2 N.N.C. § 164(B)(2), 2 N.N.C. § 185(A), the Navajo Nation Appropriations Act at Title 12, Chapter 7 et seq. and regulations promulgated pursuant to the Act, the Council’s own policies and procedures concerning financial assistance to private citizens, and well-settled fiduciary principles embodied in our fundamental law as noted herein.
I
PROCEDURAL HISTORY
We issued our Opinion in this appeal on May 28, 2010, corrected on June 2, 2010. On June 18, 2010, we issued an Order for Supplemental Briefing Concerning Attorney’s Fees and Costs requesting clarification as to the source of the appropriated funds, and all relevant regulations, resolutions and minutes regarding the specific appropriation and regarding the general spending of Navajo Nation discretionary funds. Oral argument was held on September 29, 2010 at the Fort Defiance Chapter House with all parties and amici present. As of the date of oral argument, the documents we had requested were not yet received. At oral argument, various sundry matters regarding outstanding documents and admissibility of documents were also discussed and the Court subsequently issued an Order setting a further deadline for more information to be provided. Additionally, Amici Three Delegates renewed their jurisdictional challenge and provided information to this Court that showed that their representation by the Chief Legislative Counsel (CLC) was by formal assignment of the Intergovernmental Relations Committee (IGR) of the Navajo Nation Council, and that the CLC was further required to report on developments in this appeal to the whole Council. Yet, Three Delegates continued to insist that they appear in this case as private citizens.
On October 12, 2010, pending submission of complete information on the appropriation, we issued an Order and Opinion Denying Jurisdictional Challenge, No. SC-CV-03-10 (Nav.Sup.Ct. October 12, 2010) inter alia, re-designating Three Delegates as representatives of the Real Parties in Interest (RPIs) and disposing of their jurisdictional challenges. On October 21, 2010, RPIs filed a Response on Conversion, of Amicus Curiae to Real parties in Interest and as Representatives. We address RPIs’ response herein. Addi *472 tionally, Appellees have asked that we reconsider our denial of fees to them as the prevailing party. Appellees failed to submit a request for reconsideration within the proper time limits. However, we will include reconsideration of their request in the context of the appropriation’s validity.
The Court now issues its final opinion on all remaining post-review issues.
II
JURISDICTION
Jurisdiction over all post-review matters in this case, including matters raised by amici relevant to attorneys’ fees and appropriateness of public funds, is set forth in our Order and, Opinion, Denying Jurisdictional Challenge, supra, and is incorporated herein by reference.
III
ISSUES
(a) Whether the Navajo Nation Council is properly designated as Real Party in Interest by representation of Three Delegates;
(b) Whether attorneys’ fees and costs may be properly awarded to requesting participants out of the Navajo Nation Council’s appropriation of $150,000 in public funds to pay for Appellant’s grievance and appeal.
IV
STANDARD OF REVIEW
When addressing questions of law, we apply a de novo standard of review. Begay v. Navajo Nation Election Administration, 8 Nav. R. 241, 250, 4 Am. Tribal Law 604 (Nav.Sup.Ct.2002). The specific issues addressed in this case constitute questions of law.
Additionally, attorneys’ fees fits within our Diñé concept of nályééh, which includes the responsibility to respectfully talk out our disputes and restore harmony through adequate compensation. Allstate Indemnity Co. v. Blackgoat (I), 8 Nav. R. 627, 6 Am. Tribal Law 631 (Nav.Sup.Ct. 2005). However, “adequate award” also depends on the ability to pay. Benalli v. First Nat. Ins. Co. of America, 7 Nav. R. 329, 1 Am. Tribal Law 498 (Nav.Sup.Ct. 1998). Nályééh, which emphasizes relationships, will not support an award of fees, no matter how justly earned, from funds taken improperly from the public treasury.
V
REAL PARTIES IN INTEREST
Three Delegates state that they had made a choice to participate as private citizen amici and not to intervene as parties; therefore, they should not be designated representatives of the Council and Real Parties in Interest (RPIs). Citing federal court cases, Three Delegates assert that as amici, they are volunteers who do not assume the risks and obligations of representing parties and, by conscious decision, are not participants and do not step into Appellant’s shoes. Additionally, their conversion from amici to RPIs at this late date violates Navajo notions of due process and fundamental fairness. We disagree.
As further elaborated infra, RPIs funded Appellant’s legal representation by John Trebon in this appeal through a direct payment agreement for retainer fees and costs whereby RPIs have an interest in Mr. Trebon’s performance of the grant-related activities, issue payments directly to him, and require his direct reports and compliance while no document was introduced which required either the involvement or consent of Appellant. No *473 Attorney-Client agreement between Mr, Trebon and the purported client, Mr. Nelson, was submitted in the SAS Review process [1] and it is assumed that no such agreement exists. Supplemental Brief of Louis Denetsosie, Attorney General of the Navajo Nation at 1, July 16, 2010. The absence of any contract between the attorney and his purported client makes it plain that the primary relationship is between RPIs and the attorney for both performance and fees.
Furthermore, CLC Frank Seanez volunteered that he participated in this appeal by formal assignment of the IGR. RPIs have strenuously and directly participated in this appeal through Mr. Seanez’s legal arguments and substantial challenges, which from the very beginning of this appeal were submitted more in the manner of a party. We have treated their submissions as such. In our Order and Opinion Denying Jurisdictional Challenge, supra, we fully addressed RPIs’ challenges and explained more fully why this designation is proper.
We stated in Halona v. MacDonald, 1 Nav. R. 189 (Nav.Ct.App.1978) that “no court can adjudicate directly upon a person’s right without the party being either actually or constructively before the court.” Id. at 201, citing Shields v. Barrow, 58 U.S. 130, 15 L.Ed. 158 (1855). We stated that “the key word is ‘constructively.’ ” We stated that the interests of a party “may be in certain cases adequately and fairly represented by another litigant, thus in effect putting the indispensable party before the court for all the purposes which the doctrine seems to effectuate.” Id. We find that RPIs have been constructively parties in this litigation from its inception through its agreement with Mr. Trebon and through Mr. Seanez with Three Delegates acting, essentially, as strawmen for the Council. We further find that the Council had ample notice that the legality of its appropriation was questioned, and has had every opportunity to be substituted as an actual party in order to avoid possible infirmities. There is no due process issue.
The objection of Three Delegates to their designation as representatives of the Real Parties in Interest is duly noted and denied.
VI
DISCUSSION
There are several phases to this appropriation: In the enactment phase, funds for this appropriation were moved from one object code to another in the Office of the Speaker as a “budget reallocation” whieh, as a post-appropriations budget revision, requires a 2/3 majority vote of the IGR pursuant to 2 N.N.C. § 185 and no external review. In the Navajo Nation contract review or “SAS Review” process, the contract for payment would ordinarily be subject to fiscal management review for compliance with Navajo Nation laws prior to execution, which would be the third phase. However, in this ease, a direct payment agreement, styled as a “grant agreement,” was entered into between Appellant’s counsel and the Speaker before the SAS review even commenced. There are irregularities in the enactment, and use of the “grant agreement” as payment for “financial assistance” that profoundly concern this Court.
*474 A. Program Reallocation Under 2 N.N.C. § 185
On December 23, 2009, the IGR appropriated Navajo Nation General Funds “to fund independent legal counsel for representation of Navajo Nation persons to contest the December 15, 2009 Special Election.” Intergovernmental Relations Committee Resolution IGRD-24.8-09 (December 23, 2009). The IGR voted 9-0 to reallocate $150,000 from the Office of the Speaker, Business Unit # 101015, Object Code # 7110 (Programs) to the same business unit, Object Codes # 6660, 6670 and 6680 (Attorneys Fees and Expenses). The legislation had been prepared by the CLC Mr. Seanez at the request of Thomas Walker, Council Delegate for Birdsprings, Leupp and Tolani Lake chapters. Memorandum from Frank Seanez to Thomas Walker, December 22, 2009, Second Submission of Documents to the Court (hereinafter “Second Submission”) filed by Louis Denetsosie, Attorney General of the Navajo Nation. A draft of the legislation was forwarded to Mr. Walker for review on December 22, 2009. Id. Mr. Walker also sponsored the legislation. Motion for approval of the legislation was made by Johnny Naize, Vice-Chairperson, Transportation and Community Development Committee; and seconded by Raymond Joe, Chairperson, Public Safety Committee. The legislation was engrossed as IGRD-248-09. Office of Management and Budget (OMB) Budget forms attached to IGRD-248-09 indicate that $50,000 was budgeted as fees and $100,000 as expenses. The funding source is identified as General Funds.
The very brief minutes pertaining to the passage of IGRD-248-09 show that the proposed resolution was read by the sponsor, whereupon the Speaker asked for a motion and a second, the sponsor said thank you, and the vote was taken. Transcription of IGR Dec, 23, 2009 Committee Meeting, June 28, 2009, Submission of Materials Concerning Supplemental Briefing (hereinafter “Supplemental Materials”) filed by Appellant Nelson. The legislation itself consists only of the above reallocation and a direction to OMB to reallocate the funds, plus budget forms attached as Exhibit A, with no justifications, program impact analyses, or other findings.
The circumstances surrounding this funding are obscure. In communications with staff at the Officer of the Controller, the Chief Legislative Counsel describes the reallocated funds as “financial assistance.” Memorandum of Frank Seanez to Valerie Bitsilly, February 3, 2010, Second Submission, supra However, there is no information on the original appropriated purpose of the transferred funds, no clear designation of the funds as “financial assistance,” no justification and no analyses of how the transfer will serve program purposes. There is no such program purpose as “financial assistance,” and no statutory basis for Council “financial assistance.”
We note that an “Assistance” object code exists in the Speaker’s budget. However, these funds, originally appropriated to “Programs,” were moved to the “Attorneys” object codes, and not to “Assistance.” The “Attorneys” object code is not proper for funds intended for “financial assistance,” and designating it as such obscures an honest accounting of the Council’s financial assistance funds. While this may seem a small technicality, it is one of numerous irregularities in this appropriation.
Expenditures by public officials are proper only insofar as they are authorized, explicitly or implicitly, by legislative enactment. Fiscal matters are governed by Chapter 7, Title 12 of the Navajo Nation Code. The Speaker and members of *475 the Council are not free to spend public funds for any “public purpose” they may choose, but must utilize appropriated funds in accordance with the legislatively designated purpose. Under Navajo Fundamental Law, “[a]ll public officials in the Nation have a fiduciary responsibility to the Navajo people to execute the trust the People have placed with them in the administration of the government.” Thinn v. Navajo Generating Station, No. SC-CV-25-06, 7 Am. Tribal Law 558 (Nav.Sup.Ct. Oct. 19, 2007) citing Thompson v. Navajo Nation, 6 Nav. R. 181, 183-184 (Nav.Sup.Ct.1990). This intrinsic principle was codified as follows: “The Navajo Nation government has a fiduciary responsibility to account for public funds, to manage finances wisely, and to plan for the adequate funding of services desired by the Navajo People....” 12 N.N.C. § 800. “In Navajo society, the integrity of the government is the key to its viability. If the governed cannot trust that their government is essentially just and accountable, then there arises widespread belief that the government benefits only a few.” Tuba City Judicial Dist. v. Sloan, 8 Nav. R. 159, 3 Am. Tribal Law 508 (Nav.Sup.Ct.2001). This means that governmental fiscal actions must be performed in the light of day and be fully explained.
Mr. Seanez asserts that 2 N.N.C. § 185(A) permits sizeable reallocations of program funds away from the original appropriated purpose based solely on a 2/3 majority vote of a standing committee. In light of the fiscal responsibilities imposed by the whole of our laws, and also to the restrictions contained in Section 185 itself, we cannot agree.
According to the FY2010 Navajo Nation Budget Instructions and Policies Manual (Manual), which sets forth regulations promulgated pursuant to the Navajo Nation Appropriations Act (Act) at Title 12, Chapter 7 et seq., budget transfers that change the program’s original appropriated purpose are to be considered “reallocations,” further subject to the enactment procedure set forth at 2 N.N.C. § 185(A) (Committee Powers). Mamml, Section 11(A)(8) and Section VII(E)(3) (June 10, 2009). The difficulty in this appropriation is that the original appropriated purpose was not made known in this reallocation, therefore we cannot know whether the movement of these funds is even properly a “reallocation,” nor do we know what the original program priority was, and if the transfer compromised it in any way.
The following conditions under the Act apply:
The purpose of a budget revision request shall be thoroughly justified. The justification shall include an analysis of the impact to the object code the transfer is being made from, the remaining balance for the funding term, the sufficiency of the amount being transferred, the object code the transfer is being made into and the impact to the origina,l intent of the fund. ... For programs funded by Navajo Nation funds, impacts on the programs approved performance criteria must be clearly stated.

Manual, Section V1I(E)(1) (Emphases added).

2 N.N.C. § 185(A) provides:
Subject to existing funding or contract requirements, the committees, Chapters, boards or commissions may reallocate funds appropriated by the Navajo Nation Council to the committees, boards and commissions and to divisions, departments and programs over which the committees have oversight authority, provided that, funds are determined available by the Controller, further provided that such reallocation is upon the request of the affected, division, department or program and further provided *476 that reallocation of funds is by two-thirds (2/3) vote of the full membership of the committee, board or commission.

Id. (Emphases added)

By requiring that the Controller determine availability of funds and that the reallocation is “subject to existing funding ... requirement,” Section 185(A) reinforces the Act’s fiscal conditions for justifications and program impact analysis pursuant to Section VII(E)(1) of the Manual, as these provide the basis for determining whether there are programmatic restrictions on the transfer and if there are sufficient funds to achieve the original appropriated program purpose. The Act and its regulations are comprehensive and “designed to ensure compliance with the mandate” that the Navajo Nation comprehensive budget balance revenues and expenditures. 12 N.N.C. § 820(D). Therefore, no waiver may be implied as to any of their provisions and regulations.
Mr. Seanez has asked this Court to take Section 185(A) as, essentially, repealing all other fiscal requirements imposed by the Act and its provisions on reallocations. We reject such a position. We note that in his capacity as CLC, Mr. Seanez’s frequent position was that a provision favorable to a certain position may be read by itself to the exclusion of all other provisions. We exhort the incoming 22nd Council to apply its statutes comprehensively, and in combination with principles of sound government and our fundamental laws as embodied in our statutes and fundamental law.
Additionally, an element of Section 185(A) requires that the “affected program” request the reallocation. The brief minutes and very brief legislation show no such request was made.
Historically, this Court has looked first to whether the Council strictly adhered to its own enactment procedures in passing the appropriating resolution. Judy v. White, 8 Nav. R. 510, 538, 5 Am. Tribal Law 418 (Nav.Sup.Ct.2004), citing Peabody Western Coal Co. Inc. v. Nez, 8 Nav. R. 132, 138, 3 Am. Tribal Law 497 (Nav.Sup.Ct.2001) (Procedural requirements for the enactment of Navajo Nation legislation must be strictly observed). It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute. Shirley v. Morgan, SC-CV-02-10, 9 Am. Tribal Law 46, 58 (Nav.Sup.Ct. May 28, 2010). We have further stated that “[without specific findings, the purpose of any government action will be questioned.” Shirley v. Morgan, SC-CV-02-10, 9 Am. Tribal Law at 59 (Nav.Sup.Ct. May 28, 2010).
We easily find that at least one element required under the regulations of the Act and Section 185(A) was not performed in this reallocation enactment. We find the appropriation invalid for non-compliance with 2 N.N.C. § 185(A) and Section VII(BXl) of the Manual.
B. The Council’s Financial Assistance Program
Mr. Seanez stated that the grant agreement “is to provide financial assistance to Navajo citizens in the hiring of attorneys in litigation” for the purposes set forth in IGRD-248-09. Id,. (Emphasis added). February 3, 2010 Memorandum, of Frank Seanez, supra. However, it is undisputed that there is no statutory authority for such a program, and the ability to disburse discretionary funds is not expressly stated in the limited powers of the Navajo Nation Speaker as set forth at 2 N.N.C. § 285.
That being said, various resolutions submitted by the Navajo Nation Auditor show that the Council has gone forward in promulgating “policies and procedures” for *477 two methods of Council financial assistance to private citizens:
Pursuant to IGRMA-63-07, March 9, 2007; IGRAP-87-07, April 2, 2007; IGRS-69-09, September 21, 2009, passed by the IGR, the heads of the standing committees have set forth “policies and procedures” that empower Council Delegates to award financial assistance as “constituent services” on the basis of a constituent’s financial need and a list of priorities that also include “other purposes”; such awards are uncapped, must be paid by the Council’s financial officer almost immediately upon approval by the Speaker, and subject to no procedure and no accountability.
Pursuant to IGRF-15-07, February 5, 2007, IGRMY-64-09, May 13, 2009; IGRF-20-07, February 9, 200, passed by the IGR, the heads of the standing committees have set forth “policies and procedures” that empower the Speaker to award financial assistance for burial, emergency and youth allowance, in amounts that range between $100-$3,500, the highest amounts which include burial assistance to Council delegates and other government officials, but otherwise are subject to no procedure nor accounting. The Speaker’s awards are subject to his own approval and are disbursed internally by the Council’s financial officer with no external review. The documents submitted to this Court suggest there is a similar financial assistance program in the Office of the President and Vice-President.
Amicus Hada'a Sidi contends that the availability of “financial assistance” pursuant to the above programs are not publicly known, is not advertised, and there is no dear application procedure for the Navajo People to make full use of this assistance, and that this creates a program that is rife with corruption.
The policies appear to have been enacted by IGR resolutions subject to no full Council vote, no committee review, and no external input. Additionally, the amendments lack the strike-throughs and underlining required for new laws and, therefore, plainly are not properly enacted. See Judy v. White, 8 Nav. R. 510, 5 Am. Tribal Law 418 (Nav.Sup.Ct.2004). They provide that amendments to the financial assistance procedure may be made by the IGR alone, and Resolution IGRAP-87-07 specifically purports to exclude audits from specific past periods.
We understand from the submitted documents that there is a standing practice of the Council appropriating monies for financial assistance as amendments or budget revisions to a fiscal year’s budget, even when there is no surplus. Council Resolution CJA-04-09 (January 28, 2009) provided to the Court shows that the Council expressly waived all Navajo Nation laws when it withdrew $11 million out of the Personnel Lapse Fund and, inter alia, appropriated the Office of the Speaker $5.6 million specifically for “assistance.” Id., Supplemental Materials, supra. The legislation was passed as an emergency legislation on January 28, 2009 purportedly to buy eyeglasses for Navajo children, but only $300,000 out of the millions in appropriations were designated for that purpose.[2] The laws expressly waived included *478 the Navajo Nation Appropriations Act at Title 12 et seq.
There has been a great deal of argument regarding how this Court should approach the “public purpose” requirement of Halo-na v. MacDonald, 1 Nav. R. 341 (Nav.Ct. App.1978) in light of the lack of statutory basis for the Council's practice of providing “financial assistance” to constituents. It is undisputed that there is no statutory basis for discretionary Council spending, and no actual source of funding known as “discretionary funds.” Prom the documents submitted, it appears that the Controller is called upon by the Council during the course of a fiscal year to identify accounts in which funds are available for appropriation as an amendment, supplemental, or budget revision. The Personnel Lapse Fund was such an identified funding source in 2009 and was raided through Resolution CJA-04-09 that purported to waive all Navajo Nation fiscal laws.
Our courts have said that when called upon, “the court may not decline the obligation to address the misappropriation of public funds.” Halona v. MacDonald, 1 Nav. R. 341, 351 (S.R.Dist.Ct.1978), aff'd, Halona v. MacDonald, 1 Nav. R. 189 (Nav.Ct.App.1978). Our fiscal laws and regulations ensure accountability and transparency in enacting legislation that impact the public purse and may not be waived, expressly or otherwise, without consulting the People. We have stated that laws which impact the doctrine of checks and balances, which are built-in to our financial system, are part of our organic law, and may only be amended by the People. Shirley v. Morgan, SC-CV-02-10, 9 Am. Tribal Law 46, 65-66 (Nav.Sup. Ct. May 28, 2010) and 9 Am. Tribal Law 78, 86 (Nav.Sup.Ct. July 16, 2010). People expect government to perform properly, that money will be used in a manner which they have been informed, and will not be used for private purposes. The system that appears to have been developed in the Council for “financial assistance” clearly ignores specific codified laws that require accountability, transparency, and public purposes.
The documentation provided to this Court do not show how the funding in this case came to be designated for representation of private citizen Nelson. The obscurity surrounding the choice of Mr. Nelson is another of the countless irregularities here. Without accountability as to even the choice of the person to be assisted with public funds, the door is open to influence peddling, vote buying, and other vices of an unaccountable government.
A program’s funding may be reallocated using the 2 N.N.C. § 185(A) enactment process toward a program purpose. We find that “financial assistance” through disbursements of public funds by individual government officials to constituents without strict accountability and an open application process is neither a statutorily authorized nor an identified Navajo Nation priority purpose, nor is it an identified governmental purpose under Title 2 pertaining to programs and committees of the Navajo Nation Council. While the incoming Council may choose to create such a direct disbursement program for Navajo Nation officials, the present program has not been duly established with the requisite checks and balances. Therefore, any “financial assistance” appropriation in this case also fails for this reason.
C. Navajo Nation Grants
It is undisputed that $50,000 in retainer fees were paid directly to Mr. Tre-bon through a “Navajo Nation Grant Agreement” made directly between the Legislative Branch and Mr. Trebon. RPIs assert that use of a “grant agreement” is proper because it was Appellant Nelson *479 who chose John Trebon as his attorney, therefore a payment agreement between the Navajo Nation and Mr. Trebon should not be termed an “attorney contract.” subject to Navajo Nation procurement laws.
It is apparent to this Court that irregularities abound in the “grant agreement.” The Manual clearly defines “Navajo Nation Grants” and provides for very specific conditions, in relevant part:
A. Purpose and Funds Availability
The Navajo Nation Council may appropriate funds in the form of Navajo Nation grants to eligible non-Navajo Nation governmental entities for purposes consistent with the Navajo Nation priorities and for sendees to be provided to the Navajo public. The primary purpose of a Navajo Nation grant is to fund needs and services on. a one-time basis. Navajo Nation grant awards are administered through policies and procedures developed by OMB and approved by the BFC. Navajo Nation grant awards are subject to availability of funds ...
B. Grant Budget Requirements
(2) The entity requesting the grant shall have an approved plan of operation, articles of incorporation, and a federal tax identification number, if the entity is a non-profit organization.
(3) The budget request shall be submitted to the OMB in accordance with the budget preparation instructions, formats and appropriate policies contained in this manual.
(4) The Navajo Nation grant budget proposal shall include the following :
a. A completed Navajo Nation grant application form contained in Appendix F of this manual.
b. Budget fortns 1 through 5 and 7 (and 6, if applicable) contained in this manual.
c. The entity must provide an authorizing and approving resolution or similar documentation by its Board or Commission.
d. The entity must provide a listing of current Board or Commission members with current addresses.
(5) Before submittal of the proposed budget to OMB, the budget request shall be reviewed and approved by the respective Navajo Nation division/branch providing similar services or activities, and the budget proposal shall be considered and recommended as that division’s or branch’s budget request. The grant proposal will be subject to processing/reviews in accordance with 2 N.N.C. § 16MB).
(6) The respective oversight committee for the Navajo Nation division or branch shall make a recommendation on the funding request.
(7) All Navajo Nation grantees are required to comply with the Navajo Preference in Employment Act, Navajo Nation Procurement Act, the Navajo Nation Business Opportunity Act and the Navajo Nation Appropriations Act during the authorized or active term of the grant.

Id. (Emphasis added).

In this case, there was no inclusion of this grant in a budget proposal, therefore no Section IV mandated budget review by OMB; no grant application; no plan of operations, no resolution or list of board members, no properly detailed budget on a Navajo Nation budget form submitted by the grantee; and no showing that the services rendered wrere for purposes consistent with Navajo Nation priorities or for services to be provided to the public.
Without looking further as to the reasons w'hy the Council chose to proceed with a “grant agreement,” we find that the *480 grant agreement is invalid because a substantial portion of the grant conditions were not met. We further find that the “grant agreement” is, in actual fact, an attorney contract between the Council and Mr. Trebon.
We are aware that the device of “grant agreement” was used once before in 2007 by the Council to hire an attorney for Navajo citizens as a class in a litigation against the Bureau of Indian Affairs. Supplemental Brief of the Three Delegates at 12. The one-time use of a grant agreement by the Council to hire an attorney is by no means a customary and long-time practice, and is not supported by this Court.
D. SAS Review
The grant agreement above was fully executed on January 13, 2010. Navajo Nation Grant Agreement between the Navajo Nation and John Trebon, P.C., Supplemental Materials, July 1, 2010. 2 N.N.C. § 164(B)(2) prohibit all Navajo Nation contracts to be executed prior to SAS review. The “grant agreement” was executed without any Navajo Nation fiscal administrative review and, therefore, violated Section 164(B)(2). Additionally, the irregularities in the grant-making process, supra, should have been caught in the SAS review process.
On January 15, 2010, two days after the grant agreement was executed, the SAS review process commenced. The Office of Management and Budget (OMB), Office of the Controller, and the Business Regulatory Department were to meaningfully review the agreement for compliance with Navajo law. However, on January 20, 2010, Alvin Wauneka, Acting Department Manager of the Business Regulatory Department (BRD), signed the SAS review sheet with the notation that the agreement had already been signed by the Speaker and was “already in effect.” In addition, Mr. Wauneka certified that the “[Navajo Business Opportunity Act] will not apply to this Grant Agreement.” NBOA BKD Certification, January 20, 2010, Second Submission, supra. On January 29, 2010, Dominic Beyale of the OMB stated on the SAS review sheet that “review [by OMB is] not required; see 9-25-06 memo.” Id., SAS Review No. 5103, Second Submission, supra. This Court cannot imagine how a memo supersedes our fiscal accountability laws.
2 N.N.C. § 164(B)(2) specifically requires the Controller to sign off on SAS review before a contract may be executed. On January 25, 2010, staff from the Office of the Controller submitted a “Sub-Contract Checklist” requiring more documentation from Mr. Trebon. On February 3, 2010, Mr. Seanez informed the Controller’s staff that the sub-contract checklist was improperly utilized as this was a “grant agreement ... similar to agreements [with lawyers previously made]”, and “not a contract for procurement of legal services by the Navajo Nation.” February 3, 2010 Memorandum of Frank Seanez, supra. However, the Controller’s staff continued to be concerned. On February 4, 2010, Mr. Seanez directly informed the Controller, Mark Grant, that “the payment of these sorts of legal fees through a grant agreement is not new” and that “the additional scrutiny being provided to this grant agreement, especially in light of the prior practices of the Navajo Nation relative to such matters, is becoming a matter of increasing concern.” Memorandum of Frank Seanez to Mark Grant, February 4, 2010, Second Submission, supra. That same day, the Controller requested a “demand payment” and issued a $50,000 check for “retainer fee for appeal” to Mr. Trebon. Id. However, neither the Controller’s staff nor the Controller signed the SAS review *481 sheet. No other payments to Mr. Trebon have since been made.
The Department of Justice, required pursuant to 2 N.N.C. § 164(B)(2) to also review contracts for legal compliance, was not part of this SAS review process. The SAS review process of the Legislative Branch apparently by-passes the Department of Justice in contravention of Section 164(B)(2), and at present, Legislative Branch contracts are reviewed internally only. As can be gathered from the irregularities in this case, for the public welfare, the legislating body needs greater oversight than it may prefer.
We find that the SAS review process failed the Navajo People in this case, apparently due to political pressure. Of all officials in the chain of review in this process, the Court finds that the Controller has the fiduciary role and statutory authority to deny release of funds where the Act and its regulations are not complied with. However, the Controller has to perform fiscal oversight duties while serving “at the pleasure of the Council.” 12 N.N.C. § 202(B). The Office of the Controller must play its statutory role as the ultimate gatekeeper over the public purse and must be strengthened in this role so that he is never subject to political pressure.
The Controller is reminded that his office “ensures compliance with all appropriate fiscal and financial policies.” Manual, Section XII(B). His duties as set forth at 12 N.N.C. § 850 include monitoring and reporting on actual expenditures versus budgeted expenditures; the authority to restrict expenditures in the event of shortfalls; and for developing a system for evaluating whether requirements have been met for all of Navajo Nation branches, divisions, departments, and programs. Additionally, 2 N.N.C. § 164(B)(2) requires the Controller to participate meaningfully in the contractual review process. Finally, 12 N.N.C. § 810 provides that:
Appropriated funds or any other funds received by the Navajo Nation on which a condition of appropriation or expenditure is placed may not be lawfully expended until the condition of appropriation or expenditure is met. It is the responsibility of the Controller to ensure that funds are expended in accordance with the conditions placed on the appropriation or expenditure.
12 N.N.C. § 810(1).
We urge the political branches, Council and the President to ensure that the Controller’s position is secure from political pressures as he or she watches over the public treasury.
VII
FISCAL STANDARDS
The parties and amici have called upon this Court to provide guidelines for the Council’s spending of public funds. Ami-cus Hada'a Sidi has asked that we “clarify Navajo Nation law by clearly defining the fiduciary duties of the Navajo Nation Council to the Navajo People when spending their money....” Amicus Hada1 a Sidi Brief at 9.
Governmental fiduciary duties are already set forth at 12 N.N.C. § 800, the Act, and its regulations. Pursuant to both Title 2 and 12, policies and procedures regarding spending must first be statutorily authorized before they may be deemed valid. It follows that policies and procedures that are not authorized by statute are invalid. In regards to the Council’s “financial assistance” program, monies may not be spent out of that program unless duly authorized, notwithstanding the Council’s purported existing powers to appropriate itself surplus Navajo Nation *482 funds or to waive completely Titles 2 and 12.
As a rule, all spending must be based on enabling statutes; on subsequent regulations that ensure transparency and accountability in service of the anti-corruption principle, separation of powers and checks and balances. The government is not free to spend public funds for any purpose they may choose, but must utilize appropriated funds in accordance with properly enacted designated purpose and procedure. The powers of the Speaker, specifically, are expressly defined by statute. See 2 N.N.C. § 285. Additionally, “The public treasury belongs to the Navajo people, and the legitimacy of public spending is a civil rights issue under which judicial review is mandated under the Indian Civil Rights Act. Order and Opinion Denying Jurisdictional Challenge, No. SC-CV-03-10, (Nav.Sup.Ct. October 12, 2010) citing Halona, supra, 1 Nav. R. 189 (Nav.Ct.App.1978)”, We stated:
“There are occasions when a private citizen’s interests rise above the policy decision represented by the expenditure and reach the level of civil rights which the legislative body is no less charged with protecting than the courts ... The Navajo People are supreme and all residual power lies with the People. In the end, all monies spent by the Navajo Tribal Council are monies of the Navajo People.”
Id. (emphasis added).
In the absence of properly enacted legislatively designated powers, purpose and procedure, funds may not be expended. The Court takes judicial notice that the government is currently operating on a continuing resolution set to expire soon and, therefore, the 22nd Council will have to develop an operating budget for the remainder of the fiscal year. The present direct disbursement “financial assistance” program involving Navajo Nation officials lacks the requisite checks and balances and does not operate within the comprehensive oversight structure of Navajo Nation fiscal laws and regulations. We have previously stated that the incoming Council may choose to create such a direct disbursement program for Navajo Nation officials, but such a program must be duly established with the requisite checks and balances and true public access in service of the anti-corruption principle embedded in the Title 2 Amendments. We urge the incoming 22nd Council to fully address this area of concern as an urgent matter with the President and with the assistance of the Commission on Governmental Reform.
We have stated, “It is a fundamental principle of law that public funds may not be used for private purposes, and that any such use must be declared invalid, and that principle must apply to funds of the Navajo Tribe.” Halona v. MacDonald, 1 Nav. R. 341 (Nav.Ct.App, 1978). Amicus Hada‘a Sidi argues that “public monies cannot be expended for nongovernmental purposes because the money is the property of the Navajo People and the right to it is reserved to and by the Navajo People.” Amicus Hada’a Sidi Brief at 8. We add that the private purpose prohibition is further intended to prevent governmental conflicts of interest and corruption in the use of public funds, and must be strictly enforced.
VIII
FEES
Mr. Trebon has asked that we affirm the payment of the retainer fee he received in the amount of $50,000 out of the appropriation because he played no part in the “orchestration” of the funding arrangement and has duly performed. Appellee’s counsel, Mr. Hale, asks this Court to either require the return of all monies paid to Mr. Trebon or require that *483 they be distributed to all participants who requested fees pursuant to the public purpose requirement under Halona, supra. Amici Department of Justice (DOJ) asks the Court to allow Appellant to be paid but also award fees to amicus Mr. Arthur out of the same funds pursuant to the public purpose requirement under Halona, supra. Finally, Amicus Mr. Arthur’s counsel Mr. Fitting asks this Court to adopt the "private attorney general doctrine” and additionally, states that it is important for external counsel to be able to rely on the legitimacy of representations made to them by the government that they will be paid. Amicus Hada'a Sidi also asks that the Court adopt a rule that encourages public interest litigation in the payment of fees and costs. Counsel for Amicus Hada'a Sidi and Counsel for Amici Azee’ Bee. Nahghl of the Dink Nation, Dink Hat’ aalii Association, Inc., and Dink Medicine Men Association, Inc. specifically note that they do not seek attorney fees and costs.
Firstly, there is no evidence that Mr. Trebon entered into the grant agreement with intentions other than good faith, nor that he was aware that the funds constituted a misappropriation of funds, or that he received “dirty money.” Although we find the reallocation and subsequent grant agreement invalid, we agree with Trebon that he earned his retainer fee and should be able to keep it. There is a Latin term, quantum, meruit, that means “what one has earned.” Navajos have a similar concept, ideenágo, which is the expectation that what you provide will be appreciated. However, he has no contract-based entitlement to further payments.
We understand the Private Attorney General Rule, as an exception to the American Rule, to stand for the compensation of public interest and civil rights plaintiffs for their costs, not the award of fees to amici. See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc’y, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (striking down the “Private Attorney General Rule”). The rule does not specifically apply to the requests before us by amici Arthur, who is not a plaintiff, and Appel-lee, which is a governmental body. Additionally, we decline to adopt such a rule as it would require availability of public funds duly established by the Council for that purpose. The Council may choose to establish such a fund in future.
Finally, Appellees have renewed its request for fees and Amici Arthur also press for fees “to level the playing field” under principles of fundamental fairness in the use of public funds to pay for public interest litigation. We have awarded fees to an amicus once before, in Shirley v. Morgan, supra, after recognizing a special circumstance in the advocacy of the People’s interests and actual assistance provided to the Court. However, as we previously stated, no discretionary spending out of this appropriation or other funds may be further made until statutory and regulatory bases for such spending are duly enacted. Therefore, no fees may be awarded out of the appropriation. As Appellant Nelson pressed this suit in reliance on governmental promises that his costs will be paid, he cannot be made to suffer as a consequence of that reliance, and no fees will be assessed against Mr. Nelson. The source of funding any award of fees being public funds improperly appropriated, the principle of nályééh prevents any award to be made. Therefore, we deny both Appel-lees and Amicus Arthur’s requests.
IX
CONCLUSION
For the foregoing reasons, we FIND that IGRD-248-09 and the ensuing grant agreement both invalid.
We FURTHER FIND that Appellant is entitled on the basis of ideenágo to keep the fees he has been paid, but has no *484 contract-based entitlement for further payments.
We FURTHER FIND that in keeping with the principle of ncdyééh which applies even when an award may be justly made, fees and costs may not be paid to Appel-lees and Amici Eddie Arthur out of the IGRD-248-09 reallocation or from Appellant personally.
We ORDER an immediate moratorium on all Navajo Nation “ñnancial assistance” programs as currently operated by any and all Navajo Nation government officials until a statutory and regulatory basis is in place consistent with this opinion.
We FURTHER ORDER the 22nd Council to work with the President and the Commission on Navajo Government Development as soon as possible to establish statutory and regulatory basis for Council discretionary spending via “financial assistance” programs, if such programs are desirable in the future; and strengthen the powers of the Office of the Controller, consistent with this opinion.

. Statutorily required administrative review of Navajo Nation contracts pursuant to 2 N.N.C. §164.

. In Shirley v. Morgan, supra, we invalidated emergency legislation placing President Joe Shirley on administrative leave because there was no indication that it was a bona fide emergency. We stated that, for reasons of checks and balances, all non-emergency legislation are required to be put through the very stringent process of legislative review and must be co-signed by representatives of at least two of the branches. Id. at 39. We repeat that here.